IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CHRISTOPHER ROBIN ALBRIGHT    )   Civ. No. 21-00507 HG-KJM
                           )
           Plaintiff,     )
                           )
        vs.             )
                           )
KILOLO KIJAKAZI, Acting    )
Commissioner of Social     )
Security,                )
                           )
          Defendant.     )
                           )
_____)

**ORDER AFFIRMING THE DECISION OF THE
SOCIAL SECURITY ADMINISTRATION COMMISSIONER**

This case involves the appeal of the Social Security Administration Commissioner's decision to deny Plaintiff Christopher Robin Albright's application for Disability Insurance Benefits.

On May 7, 2019, Plaintiff filed an application for Disability Insurance Benefits, claiming he was disabled beginning on September 30, 2018.  Plaintiff's application alleges physical and psychological impairments, including degenerative disc disorder of his upper and lower back, depression, and post-traumatic stress disorder.

The Social Security Administration denied Plaintiff's initial application and his request for reconsideration. Following an administrative hearing, the Administrative Law Judge

1

("ALJ") held that Plaintiff was not disabled from September 30, 2018 to March 31, 2021, the date of the ALJ's written decision.

The Social Security Administration Appeals Council denied Plaintiff's request for further review, rendering the ALJ's decision the final administrative decision of the Social Security Commissioner.

The Court **AFFIRMS** the decision of Social Security Administration Commissioner to deny Plaintiff's application.

## PROCEDURAL HISTORY

On May 7, 2019, Plaintiff Christopher Robin Albright applied for Disability Insurance Benefits with the Social Security Administration.  (Administrative Record [hereinafter "AR"] at pp. 157-60, ECF No. 8).

On October 14, 2019, the Social Security Administration denied Plaintiff's application.  (AR at pp. 92-95).

On November 7, 2019, Plaintiff sought reconsideration of the Social Security Administration's initial decision.  (AR at p. 98).

On December 24, 2019, the Social Security Administration denied Plaintiff's application upon reconsideration.  (AR at pp. 99-101).

On January 27, 2020, Plaintiff requested a hearing before an ALJ.  (AR at p. 102).

2

On February 23, 2021, the ALJ held a hearing on Plaintiff's application.  (AR at pp. 31-57).  The hearing was held via telephone due to the COVID-19 pandemic.

On March 31, 2021, the ALJ issued a written decision denying Plaintiff's application.  (AR at pp. 15-30).

On October 27, 2021, the Social Security Administration Appeals Council denied Plaintiff's request for further review of the ALJ's decision.  (AR at pp. 1-3).  The ALJ's decision became the final administrative decision of the Social Security Administration Commissioner after Plaintiff was denied further review.

On December 27, 2021, Plaintiff filed a Complaint in the United States District Court for the District of Hawaii, seeking judicial review of the Social Security Administration Commissioner's denial of his application.  (ECF No. 1).

On July 8, 2022, Plaintiff filed PLAINTIFF'S OPENING BRIEF. (ECF No. 11).

On August 24, 2022, Defendant filed DEFENDANT'S ANSWERING BRIEF.  (ECF No. 12).

On September 8, 2022, Plaintiff filed PLAINTIFF'S REPLY BRIEF.  (ECF No. 13).

On October 11, 2022, the Court held a hearing on Plaintiff's appeal of the decision of the Social Security Administration Commissioner.  (ECF No. 15).

**BACKGROUND**

Plaintiff was born in 1977 and is currently 45 years old. (AR at pp. 35, ECF No. 8).  He is a high school graduate and completed one year of college.  (AR at p. 36).  Plaintiff is also a veteran, having served with the U.S. Army as a paratrooper from June 19, 1997 to March 10, 1999.  (AR at pp. 157, 275).

Plaintiff was allegedly involved in a parachuting accident during his service in the military.  (AR at pp. 333, 368, 649). He allegedly experienced a "hard landing" when his parachute did not open correctly.  (AR at p. 368).  Plaintiff claims that the landing was the equivalent of having fallen from a three-story building.  (AR at p. 368).  Plaintiff attributes his ailments -- including the start of back pain and his psychological issues -- to his parachuting incident.  (AR at pp. 35, 332).

## I.   Plaintiff's Work History

Plaintiff claims an onset date of disability of September 30, 2018.  (AR at p. 157).  In the years since his parachuting accident, but preceding his claimed onset of disability, Plaintiff held numerous positions of employment involving various skills and degrees of manual labor.

At various points between 2004 and 2014, Plaintiff worked for a marketing firm.  (AR at pp. 40, 170, 215).  Plaintiff traveled to businesses and assembled marketing materials on site,

4

such as posters supported by wooden frames.  (AR at p. 40).
Plaintiff carried items weighing as much as thirty pounds.  (AR
at p. 40).

In 2006, Plaintiff worked for a printing company and
operated its printing press.  (AR at pp. 41, 169).  Plaintiff's
job required that he load and unload paper onto the printing
press, weighing as much as thirty pounds.  (AR at p. 41).

At various points throughout 2008 to 2010, Plaintiff worked
as a bartender and a server at a family-owned restaurant.  (AR at
pp. 39-40, 170, 215).  Plaintiff was required to periodically
carry beer kegs, weighing approximately fifty pounds.  (AR at pp.
39-40).

From September 2014 to September 2015, Plaintiff worked as a
bartender at a sports bar.  (AR at pp. 215, 220).  Plaintiff's
duties included mixing and serving drinks, transporting beer and
liquor from storage to the front of the house, restocking
supplies, and cleaning.  (AR at p. 220).

From October 2015 to January 2016, Plaintiff worked as a
package delivery driver.  (AR at pp. 215, 219).  Plaintiff drove
a truck and carried parcels from the truck to recipients' doors.
(AR at p. 219).  Plaintiff carried parcels weighing as much as
fifty pounds.  (AR at p. 219).

From February 2016 to May 2016, Plaintiff worked as a car
salesman.  (AR at pp. 38, 215).  The job required that Plaintiff

be on his feet all day, and walk around the dealership lot in order to interact with potential customers.  (AR at pp. 38, 218).

From May 2016 to August 2016, Plaintiff again maintained a job as a restaurant server.  (AR at pp. 38, 215).  Plaintiff's responsibilities included taking orders, delivering food, mixing drinks, and cleaning.  (AR at p. 38).  Plaintiff testified that he regularly carried trays full of food, weighing as much as thirty pounds.  (AR at p. 38).

Most recently, from September 2016 to October 2018, Plaintiff worked as an apprentice electrician.  (AR at pp. 36, 215).  Plaintiff assisted in wiring homes with electricity.  (AR at p. 37).  Plaintiff's duties included various kinds of manual labor, such as pulling electrical wire throughout a house, climbing ladders, and crawling into attics and on floors.  (AR at p. 37).  Plaintiff occasionally lifted equipment weighing as much as twenty pounds.  (AR at pp. 37, 216).

## II.  Plaintiff's Medical History

Plaintiff claims that he stopped working in 2018 as a result of a combination of physical and psychological disabilities, although examination notes indicate that Plaintiff told his doctors that he stopped working as a result of back pain.  (AR at pp. 34-35, 374).

Plaintiff's application for Disability Insurance Benefits

claimed physical and psychological impairments, including lumbar and cervical spine degeneration, depression, and post-traumatic stress disorder.

## A.   Physical Impairments

Plaintiff's medical records demonstrate that he was diagnosed with degenerative disc disorder in his lumbar spine. X-ray and MRI imaging of Plaintiff's lumbar spine showed mild to moderate stenosis, referring to narrowing of the spinal canal, and a bulging disc.  (AR at pp. 286, 365).  Similarly, Plaintiff's cervical spine showed advanced degenerative disc space narrowing.  (AR at p. 287).  X-ray and MRI imaging of Plaintiff's cervical spine revealed mild to moderate disc degeneration and narrowing of the spinal canal.  (AR at p. 282).

On February 23, 2021, Plaintiff testified that he experienced pain radiating from his back into his legs, feet, shoulders, arms, and hands.  (AR at p. 43).  Plaintiff claimed that he periodically needed to lie down, and could not walk or be active for more than thirty minutes at a time.  (AR at p. 44). Plaintiff stated that he sometimes walked using a cane, but tried to avoid it.  (AR at p. 43).

On September 13, 2019, Plaintiff saw Dr. Graeme Reed for an orthopaedic examination.  (AR at pp. 367-72).  Dr Reed's examination found that Plaintiff was able to walk unassisted

without difficulty and without a limp.  (AR at p. 369).
Plaintiff exhibited full strength in his extremities and
appropriate reflexes.  (AR at p. 371).  Dr. Reed did find some
limitations in Plaintiff's range of motion with respect to his
cervical and lumbar spine.  (AR at p. 369).  Subsequent
examinations were consistent with Dr. Reed's findings.  (See,
e.g., AR at pp. 473-75).

Plaintiff reported significant back pain, but the medical
evidence showed that Plaintiff's condition was mitigated through
the use of pain medication, physical therapy, stretching, and the
application of ice and heat.  (AR at pp. 461-64, 730, 745).

On February 5, 2018, Plaintiff began engaging in physical
therapy and received an epidural that alleviated his pain.  (AR
at pp. 529, 546).

In June 2018, Plaintiff was prescribed hydrocodone-
acetaminophen and Lyrica by his pain management physician, Dr.
James Van Natta.  (AR at pp. 518-25).  After several months with
medication and physical therapy, Plaintiff reported diminished
levels of pain.  (AR at p. 505).

Throughout 2019, Plaintiff continued to report diminished
levels of pain while on medication.  (AR at pp. 493, 497, 501).

In 2020, Plaintiff reported a slight increase in his level
of pain, but continued to report significant relief through the
use of medication.  (AR at pp. 736, 745, 752).

### B.   Psychological Impairments

Plaintiff's medical records reflect a diagnosis of moderate depression.  (AR at p. 339, 445, 802-03).  At various points, he reported a variety of psychiatric symptoms, including social avoidance, panic attacks, obsessive ruminations, fatigue, feelings of worthlessness, trouble concentrating, poor memory, low motivation, fidgeting, and difficulty sleeping.  (AR at pp. 45, 327-28, 423, 443).

Plaintiff's records also reflected a diagnosis for Post Traumatic Stress Disorder (PTSD) on December 17, 2018.  (AR at pp. 389, 802-03).  On February 23, 2021, Plaintiff testified before the ALJ that he suffered symptoms as a result of his PTSD diagnosis, but Plaintiff's medical records reflected that throughout 2020, Plaintiff told his treating medical providers that he no longer had any PTSD symptoms and did not require medication to treat any negative symptoms.  (AR at p. 45, 785, 797).

A review of the medical records demonstrates that Plaintiff entered treatment for his psychological issues in early 2018. Plaintiff's was initially prescribed Wellbutrin to treat his symptoms.  (AR at p. 451).  Plaintiff's symptoms reportedly persisted and, by July 2019, he stated that he discontinued use of Wellbutrin, having "los[t] faith in it."  (AR at p. 435).

9

On September 30, 2019, Plaintiff met with Dr. Rebecca Gladding, a psychiatrist affiliated with the Department of Veteran Affairs.  (AR at p. 391-93).  Dr. Gladding recommended that Plaintiff begin treatment with Cymbalta to manage his depression.  (AR at p. 391-93).  Plaintiff stated that he had used Cymbalta previously but discontinued its use when he first arrived in Hawaii because he was feeling better.  (AR at p. 390).  He agreed to try Cymbalta again pursuant to Dr. Gladding's prescription.  (AR at p. 391-92).

During the same consultation, Plaintiff's psychiatrist suggested that he get a dog for "emotional support."  (AR at p. 392).  Dr. Gladding also suggested acupuncture, continued therapy, and that Plaintiff "work on adding more meaning/purpose into life."  (AR at p. 392).

In October 2019, Plaintiff adopted a dog.  (AR at p. 381).  Plaintiff reported that his symptoms improved after getting the dog, and that it "motivated him to get out of the house more."  (AR at p. 381).  Plaintiff stated that he took his dog out at least three times a day, which gave "structure and meaning" to his time.  (AR at p. 381).

On October 28, 2019, Plaintiff reported that his prescription for Cymbalta had "helped with [his] chronic pain and depression," but also caused him to feel increased anxiety.  (AR at p. 385).  Dr. Gladding increased Plaintiff's dosage to address

his increased anxiety.  (AR at p. 385).

On January 6, 2020, Plaintiff reported to Dr. Gladding that he continued to find Cymbalta "helpful for his symptoms."  (AR at p. 817).  Dr. Gladding referred Plaintiff to Nurse Practitioner Mary Mossman for continued treatment.

### C.  Plaintiff Stops Taking Antidepressant Medication

In February 2020, shortly after he began seeing Nurse Practitioner Mossman, Plaintiff indicated that he was no longer interested in pharmaceutical treatment for his psychological symptoms.  (AR at p. 802).  For example, on March 4, 2020, Plaintiff stated that he had stopped using Cymbalta, and was committed to not taking any antidepressants for the time being. (AR at p. 801).  On April 1, 2020, Plaintiff stated he was "feeling good" and denied having any PTSD symptoms.  (AR at p. 797).  He also "[r]emain[ed] committed to refusing antidepressant medications."  (AR at p. 797).  On May 4, 2020, Plaintiff stated he was "doing okay" and again refused pharmaceutical treatment for his psychological issues.  (AR at p. 794).

On July 16, 2020, Plaintiff reported to Nurse Practitioner Mossman that he was preparing for a two-month trip to the mainland with his parents.  (AR at p. 791).  He stated that his mood was "blah, lacking motivation" but that he was "not depressed anymore" despite discontinuing Cymbalta six months

prior.  (AR at p. 791).  Plaintiff indicated that his dog helped to alleviate his symptoms, stating that he "takes [the] dog outside every hour to get them both moving."  (AR at p. 791).

On October 5, 2020, Plaintiff spoke with Nurse Mossman by phone while he was on the mainland.  (AR at pp. 784-86). Plaintiff reported that he was feeling "pretty stable being back here."  (AR at p. 785).  He stated that the trip had done what he had hoped for in terms of stabilizing his mood.  (AR at p. 785). Plaintiff again acknowledged that he "feels no need[] to take medication."  (AR at p. 785).

## STANDARD OF REVIEW

A claimant is disabled under the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

A decision by the Commissioner of Social Security must be affirmed by the District Court if it is based on proper legal standards and the findings are supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

12

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>see also</u> <u>Tylitzki v. Shalala</u>, 999 F.2d 1411, 1413 (9th Cir. 1993).

## **ANALYSIS**

### I.  **Applicable Law**

The Social Security Administration has implemented regulations establishing when a person is disabled so as to be entitled to benefits pursuant to the Social Security Act, 42 U.S.C. § 423.  The Commissioner of the Social Security Administration evaluates a disability claim using the following five-step sequential analysis:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled. If not, proceed to step two.

(2)  Is the claimant's alleged impairment sufficiently severe to limit his ability to work?  If not, the claimant is not disabled. If so, proceed to step three.

(3)  Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is disabled.  If not, proceed to step four.

(4)  Does the claimant possess the residual functional capacity to perform his past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.

(5)  Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow him to adjust to other work that

13

exists in significant numbers in the national economy?
If so, the claimant is not disabled.  If not, the
claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir.
2006) (citing 20 C.F.R. §§ 404.1520, 416.920).

A claimant alleging disability has the burden of proof at
steps one through four, and the Commissioner has the burden of
proof at step five.  Bustamante v. Massanari, 262 F.3d 949,
953-54 (9th Cir. 2001).

## II.  The ALJ Applied the Five-Step Evaluation

The ALJ evaluated Plaintiff's disability claim using the
five-step analysis.

At step one, the ALJ found that Plaintiff has not engaged in
substantial gainful activity since the alleged onset date of his
disability, September 30, 2018.  (AR at p. 17, ECF No. 8).

At step two, the ALJ found Plaintiff had the following
severe impairments that significantly limit his ability to
perform basic work activities: degenerative disc disease of the
lumbar spine; degenerative disc disease of the cervical spine;
depressive disorder; post-traumatic stress disorder (PTSD); and
neurodevelopmental disorder.  (AR at p. 17).

At step three, the ALJ found that Plaintiff did not have an
impairment or combination of impairments that meets or medically
equals the severity of one of the listed impairments in 20 C.F.R.

14

Part 404, Subpart P, Appendix 1.  (AR at p. 18).

At step four, after having carefully considered the entire record, the ALJ found that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), subject to the following limitations:

> he could lift and carry 20 pounds occasionally and 10 pounds frequently; he could stand and walk six hours in an eight-hour workday; he could sit six hours in an eight hour day; he could never crouch, crawl, or climb ladders, ropes, or scaffolds; he could occasionally balance, stoop, kneel, or climb ramps or stairs; he could reach overhead bilaterally on a frequent basis; he should avoid even moderate exposure to noise; he should avoid concentrate exposure to hazardous machinery and unprotected heights; he could have occasional changes in the work setting; he cannot perform production-rate pace work; he could have [] frequent interactions with the public, coworkers, and supervisors; he would be off-task up to 10% of the workday due to psychological symptomatology.

(AR at pp. 19-20).

The ALJ concluded that Plaintiff was unable to perform any past relevant work.  (AR at p. 24).

At step five, the ALJ found that, considering the Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform, such as office helper, mail sorter, and price marker.  (AR at pp. 24-25).

The Parties do not dispute the ALJ's conclusions as to the first three steps of the evaluation.

## III. **The ALJ Properly Denied Plaintiff's Application**

The appeal from the decision of the Social Security Administration Commissioner focuses on the ALJ's findings at step four.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work, subject to certain limitations.  (AR at pp. 19-20, ECF No. 8).  In formulating Plaintiff's residual functional capacity, Plaintiff considered the testimony and evidence in the record regarding Plaintiff's physical and psychological impairments.

### A.   **Physical Impairments**

The ALJ acknowledged that the evidence in the record, including Plaintiff's testimony and objective medical evidence, demonstrated that Plaintiff has disc degeneration in his cervical and lumbar spine.  (AR at pp. 21, 282-86, 365).  Despite the condition, the ALJ determined that Plaintiff was still capable of light work, subject to certain limitations.

The ALJ highlighted numerous factors that supported the findings in his written decision.  For example, the ALJ cited examination notes showing that Plaintiff was able to walk without difficulty, exhibited full strength in his lower extremities, with some limitations in his range of motion.  (AR at pp. 21, 367-72, 473-75).  Treatment records from the relevant time period

16

also showed that Plaintiff's back pain was significantly
mitigated through the use of pain medication.  (AR at pp. 461-64,
730, 745).  Plaintiff reported that he also managed his pain
using meditation, breathing exercises, and stretching.  (AR at p.
381).

The ALJ underscored numerous reports of Plaintiff engaging
in activities that indicate his back condition would not preclude
him from working.  (AR at pp. 21, 22).  Plaintiff's records
reflected that, during the relevant time period, Plaintiff
enjoyed gardening, working in his yard, shopping, going to the
beach, yoga, and fishing on a daily basis.  (AR at pp. 375, 381,
390, 784-85).

In October 2019, Plaintiff reportedly adopted a dog which he
took outside for walks at least three times a day, including
periodic visits to dog parks and other dog-friendly areas
outdoors.  (AR at p. 381).  In October 2020, Plaintiff indicated
that he was taking his dog outside every hour.  (AR at p. 791).
Also in October 2020, Plaintiff informed his treatment providers
that he traveled to the mainland for two months.  (AR at pp. 784-
85).

Evaluations from numerous doctors supported the ALJ's
findings.  For example, the ALJ cited the September 2019 medical
opinion of Dr. Graeme Reed, which was consistent with the idea
that Plaintiff could perform light work with some limitations.

17

(AR at p. 23).

Reports authored by state agency medical consultants also supported the ALJ's findings.  (AR at p. 24).  For instance, the October 2019 report authored by Dr. N. Shibuya indicated that Plaintiff could engage in light work, and the December 2019 report of Dr. W. Matsuno echoed that conclusion.  (AR at p. 24).

### B.    Psychological Impairments

The ALJ acknowledged that Plaintiff's testimony and the medical evidence established that he has had several psychological impairments, including previous diagnoses for depression and PTSD.  (AR at pp. 21-22).  The ALJ found that the impairments did not limit Plaintiff as much as he alleged, and that Plaintiff was still capable of performing certain light work.

The ALJ pointed out that Plaintiff's psychological evaluations revealed only mild or moderate limitations.  A February 2019 neuropsychological evaluation found that Plaintiff had "average" cognitive functioning.  (AR at pp. 290-92).  The same evaluation concluded that Plaintiff had "low average" memory, but that he had superior recall of complex figures after long delay.  (AR at pp. 290-92).

A September 2019 evaluation similarly found that Plaintiff had no cognitive impairment.  (AR at pp. 374-77).  An assessment

18

conducted in March 2020 found normal speech and thought content, intact memory, and that Plaintiff's concentration was sustained and within normal limits.  (AR at pp. 802-03).

Numerous activities chronicled throughout the record belied Plaintiff's allegations that his psychological impairments prevented him from working at all.  For example, Plaintiff stated that he enjoyed gardening and working in his yard.  (AR at p. 375).  Plaintiff also indicated that he regularly went on shopping trips, and occasionally to the beach.  (AR at p. 375). Plaintiff reported that he meditated on a daily basis, and engaged in yoga exercises.  (AR at pp. 390, 785).  As recently as October 2020, Plaintiff reported to his medical health providers that he went fishing on a daily basis.  (AR at pp. 784-85).

The ALJ also relied upon evidence that Plaintiff traveled to the mainland for two months in 2020.  (AR at pp. 784-85, 791). Plaintiff reported that he traveled from Hawaii to Minnesota in August 2020 for a visit with his parents.  (AR at pp. 784-85, 791).  Plaintiff stated that in October 2020 he extended the visit and planned to stay in Minnesota until after Thanksgiving 2020.  (AR at pp. 784-85). Plaintiff told his treatment provider that the trip resulted in him feeling "pretty stable" and that it "reset" his mood.  (AR at pp. 785).  Plaintiff's mental health provider noted that Plaintiff chuckled while discussing his trip. (Id.)

The ALJ also relied on Plaintiff's activities with his dog as a basis to find that Plaintiff was not as limited as he claimed.  In October 2019, Plaintiff's psychiatrist suggested that he get a dog for emotional support.  (AR at p. 426).  Plaintiff adopted a dog from a pound and subsequently stated that the dog "motivated him to get out of the house more," and gave "structure and meaning" to his time.  (AR at p. 381).  The ALJ found that Plaintiff's prior reports of social isolation had been mitigated, as that Plaintiff had recently been "interacting more socially," and bringing his dog to meet his neighbors.  (AR at p. 381).

The ALJ highlighted that Plaintiff reported he no longer needed medication to treat his psychological issues.  Plaintiff was prescribed Cymbalta when he first moved to Hawaii, but discontinued its use shortly thereafter because he was feeling better.  (AR at p. 390).  Plaintiff began taking Cymbalta again in September 2019 until Spring 2020.  (AR at p. 392).  During this time, Plaintiff reported that his depression well-managed by medication.  (AR at pp. 385, 392, 817).  In Spring 2020, Plaintiff stopped using Cymbalta because he was feeling better, and stated he did not want to take other pharmaceutical treatments.  (AR at pp. 794, 797, 801).

The ALJ also reviewed various reports and medical opinions in making his determination as to Plaintiff's psychological

impairments.  The ALJ relied on state agency medical consultant
Dr. R. Torigoe's opinion as to Plaintiff's psychological
limitations.  (AR at p. 23).  The ALJ also considered a report by
Dr. Tanya D'Avanzo, and the medical opinion by Dr. Michael
Rabara.  (AR at p. 22).  The ALJ considered Dr. Rabara's findings
from his examination of the Plaintiff, but the ALJ found Dr.
Rabara's conclusions regarding Plaintiff's psychological
limitations were not persuasive.  (AR at p. 23).

The ALJ concluded that the evidence in the record did not
support a finding that Plaintiff was disabled.  The ALJ reached
his decision after consideration of the entire record, including
Plaintiff's testimony, objective medical evidence, and the
various medical opinions submitted with Plaintiff's claim.

## IV.  The ALJ's Treatment of Medical Opinions Was Proper

At step four, the ALJ articulated his view as to the
persuasiveness of the medical opinions in the record.  The ALJ
explicitly discussed the persuasiveness of medical opinions
authored by Dr. Graeme Reed (AR at pp. 367-72), Dr. Michael
Rabara (AR at pp. 374-77), Dr. R. Torigoe (AR at pp. 58-69), Dr.
G. Yanagi (AR at pp. 73-90), and Dr. N. Shibuya (AR at pp. 69-
71).  On appeal, Plaintiff challenges the ALJ's evaluation of Dr.
Michael Rabara's medical opinion, and the ALJ's treatment of a
report authored by Dr. Tanya D'Avanzo.

21

First, Plaintiff argues that the ALJ improperly rejected the medical opinion of Dr. Michael Rabara, Psy.D.  (Pl.'s Br. at pp. 16-21, ECF No. 11).  Plaintiff claims that the ALJ did not adequately consider the opinion's supportability and consistency with the overall record.

Second, Plaintiff argues that the ALJ failed to adequately assess a neuropsychological evaluation undertaken by Dr. Tanya D'Avanzo, Ph.D.  (Id. at pp. 11-16).  Plaintiff claims that the ALJ should have treated Dr. D'Avanzo's evaluation as a medical opinion, as opposed to mere medical evidence.

Plaintiff's arguments are not supported by the record.

## A.    The Commissioner's Revised Regulations

On January 18, 2017, the Social Security Administration issued revised guidance regarding the evaluation of medical evidence.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017).  The revised regulations impose new requirements for how ALJs evaluate medical opinions in the administrative record.  Id.

An ALJ is required to consider all relevant evidence in the record, including all medical opinions, to determine whether a claimant is disabled.  20 C.F.R. § 404.1520c.  A medical opinion is a specific category of evidence that is provided by a medical source, such as the claimant's own physician or a government

consultant.  20 C.F.R. § 404.1513(a)(2).  The new regulations eliminate the hierarchical treatment of medical opinions whereby more weight was generally given to the opinion of a treating physician than to a physician who did not treat the claimant.  82 Fed. Reg. at 5844.  Under the revised regulations, there is not inherent persuasiveness to evidence from an individual's own medical sources over government consultants, or vice versa.  Id.

By definition, a medical opinion contains a statement regarding what the claimant can do despite his limitations, and whether the claimant has one or more impairment-related restrictions in work-related activities.  20 C.F.R. § 404.1513(a)(2).  An ALJ must consider each medical opinion, but need not adopt the opinion's conclusions.  It is the responsibility of the ALJ -- not the claimant's physician -- to determine the claimant's abilities and limitations for purposes of their residual functional capacity.  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing 20 C.F.R. § 404.1545).

An ALJ must provide an explanation in order to reject a conclusion provided by a medical opinion.  Under the regulations, an ALJ is required to "articulate ... how persuasive" he finds "all of the medical opinions" from each doctor or other source.  20 C.F.R. § 404.1520c(b).  The regulations also require that the ALJ use certain factors to assess the persuasiveness of a medical opinion, the most important of which are the factors of

"supportability" and "consistency."  20 C.F.R. § 404.1520c(a).

On April 22, 2022, the Ninth Circuit Court of Appeals issued its decision in <u>Woods v. Kijakazi</u>, addressing the revised regulations.  32 F.4th 785 (9th Cir. 2022).  Prior to <u>Woods</u>, the case law in this jurisdiction required that an ALJ provide specific and legitimate reasons for rejecting an examining doctor's opinion.  <u>Id.</u> at p. 787.  Now, in light of the revised regulations, the Ninth Circuit has held that an ALJ's rejection of a conclusion provided by a medical opinion need only be supported by substantial evidence.  <u>Id.</u>

**B.   Dr. Michael Rabara, Psy.D**

On September 25, 2019, Dr. Michael Rabara examined Plaintiff for a consultative mental status evaluation.  (AR at pp. 374-78, ECF No. 8).  Dr. Rabara issued a report that provided information as to Plaintiff's activities of daily living, background, performance on a neuropsychological screening test, and the doctor's clinical findings.  Dr. Rabara diagnosed Plaintiff as having an unspecified depressive disorder.  (AR at p. 377).

Dr. Rabara's report provided his opinion about Plaintiff's limiations despite his impairments.  (AR at p. 378).  Dr. Rabara's opinion stated that Plaintiff had no "significant limitations" in terms of understanding and memory in the work environment, and no limitations whatsoever with respect to social

interaction.  (AR at p. 378).

With regard to sustained concentration and persistence, Dr. Rabara stated that Plaintiff "can carry out simple instructions and make simple decisions," but that, due to his depression, Plaintiff "will have difficulty carrying out detailed instructions, sustaining his concentration, and completing a normal workday at a consistent pace."  (AR at p. 378).  Dr. Rabara also found that Plaintiff "will have difficulty responding appropriately to work setting changes."  (AR at p. 378).

The ALJ considered the evidence put forward by Dr. Rabara, and concluded that Dr. Rabara's opinion with respect to the extent of Plaintiff's workplace limitations was "not persuasive or generally consistent with the overall record."  (AR at p. 23). The ALJ analyzed Dr. Rabara's opinion pursuant to the supportability and consistency factors by pointing out areas in which Dr. Rabara's conclusions were not supported by other medical evidence or were inconsistent with the record as a whole.

**Supportability**:  The ALJ found that Dr. Rabara's conclusion regarding Plaintiff's concentration and persistence in the workplace was not supported by Dr. Rabara's own medical findings. (AR at p. 23).  For example, Dr. Rabara's own assessment revealed that Plaintiff scored 27 out of 30 on the mini-mental state examination.  (AR at p. 377).  Dr. Rabara's clinical finding that Plaintiff had no cognitive impairment was inconsistent with his

own conclusion that Plaintiff would not be able to carry out
detailed instructions or sustain his concentration.  Such
internal inconsistencies are relevant evidence for the ALJ to
consider in evaluating a medical opinion.  See Morgan v. Comm'r
of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999).

**Consistency:**  The ALJ identified numerous ways Dr. Rabara's
opinion conflicted with the overall record.  Dr. Rabara indicated
that Plaintiff would be incapable of completing a workday at a
consistent pace, however, the record reflected that Plaintiff
engaged in numerous sustained activities without issue.  The ALJ
specifically cited evidence indicating that Plaintiff had
sufficient focus to go to shops, to go to the beach, to take his
dog outside multiple times a day, to visit neighbors, to travel
to the mainland, and to fish outdoors on a daily basis.  (AR at
p. 23, ECF No. 8).  Such activities were not consistent with Dr.
Rabara's conclusion.  The ALJ properly relied on the
inconsistencies to find Dr. Rabara's medical opinion
unpersuasive.  Morgan, 169 F.3d at 600-02 (9th Cir.1999)
(considering an inconsistency between a physician's opinion and a
claimant's daily activities as a basis to discount the
physician's opinion).

The ALJ appropriately considered Dr. Rabara's clinical
findings.  The ALJ properly declined to credit Dr. Rabara's
ultimate conclusions with respect to Plaintiff's limitations.

26

The ALJ determined that Plaintiff had work limitations, but he did not adopt Dr. Rabara's opinion that Plaintiff required extensive limitations.  (AR at pp. 20, 23).  The ALJ's determination as to the persuasiveness of Dr. Rabara's opinion, and the ALJ's decision to reject Dr. Rabara's conclusions, is supported by substantial evidence.  <u>Woods</u>, 32 F.4th at 787.

### 1.    Plaintiff's Depression

Plaintiff argues that the ALJ overlooked the fact that Dr. Rabara's conclusions were based on Plaintiff's diagnosis for depression.  (Pl.'s Br. at p. 18, ECF No. 11).

The record demonstrates that the ALJ considered Plaintiff's prior diagnosis for depression and the extent it could limit Plaintiff's workplace activities.  The ALJ cited Plaintiff's adoption of a dog to treat his psychological condition.  (AR at p. 22, ECF No. 8).  Plaintiff reported that the adoption of his dog caused him to feel better, focused, and more outgoing.  (AR at p. 381).  The ALJ similarly referenced Plaintiff's trip to the mainland in August 2020, which reportedly stabilized Plaintiff's mood.  (AR at p. 22).

The ALJ found that in early 2020, Plaintiff had reported that his symptom improvement was sufficient to cause him to stop using medication to treat his depression.  (AR at pp. 22, 801).  Plaintiff's daily fishing excursions, visits to the beach, and

ability to go shopping was inconsistent with Plaintiff's testimony that he was unable to work at all due to the alleged severity of Plaintiff's depression.

The ALJ's decision is supported by substantial evidence. Woods, 32 F.4th at 793.

### 2.   Adoption of a Dog

Plaintiff faults the ALJ for not concluding that Plaintiff's dog was an emotional support animal.  (Pl.'s Reply at p. 8-9, ECF No. 13).  Plaintiff argues that the ALJ should have concluded that Plaintiff would not be able to work without the presence of the dog.  (Id.)

Neither Plaintiff nor his counsel claimed before the ALJ that Plaintiff would need an emotional support animal for work-related activities at the hearing.  Plaintiff raises the issue for the first time on appeal and the Court does not consider it. Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) ("[A]t least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal.").

Even if Plaintiff had exhausted the argument, there is no evidence in the record to support the idea that Plaintiff would need a service animal in order to engage in work activities.  The record reflects that Plaintiff's mental health provider later

28

composed a letter for Plaintiff claiming he needed an emotional support animal in order to travel on an airplane, not to work. (AR at p. 793).  There is no evidence indicating Plaintiff would need to have the dog on the job.  Courts have held that a letter from a medical provider about an individual's use of a service animal does not establish that a dog is medically necessary in a work environment.  See, e.g., Early v. Kijakazi, 2022 WL 2057467, at *5 (W.D.N.C. June 7, 2022); Payano v. Colvin, 2017 WL 4778593, at 4 (D. Nev. Oct. 23, 2017).

The ALJ's consideration of Plaintiff's dog in his rejection of Dr. Rabara's opinion was proper.  The ALJ cited evidence showing that Plaintiff adopted the dog, and that the dog did help with Plaintiff's psychological symptoms.  (AR at p. 21-23). Evidence of improvement subsequent to treatment is a legitimate consideration when evaluating a medical opinion.  Merritt v. Colvin, 572 F. App'x 468, 470 (9th Cir. 2014).

The ALJ's conclusions concerning Plaintiff's adopted dog are supported by substantial evidence.

### 3.    The ALJ's Citations to the Record

Plaintiff takes issue with the ALJ's citations in his analysis of Dr. Rabara's medical opinion.  (Pl.'s Br. at p. 17-20, ECF No. 11).

First, Plaintiff states that one of the ALJ's citations

29

refers to pages that do not exist in the record.  (Id. at p. 17).
In fact, the error is a typo by one digit.

On page 9 of his opinion, the ALJ cited to Exhibit 11F,
pages 31 and 32, in his assessment of Dr. Rabara's medical
opinion.  (AR at p. 23, ECF 8).  Plaintiff points out that
Exhibit 11F ends at page 26 and does not have pages 31 or 32.
(See AR at p. 754).  Plaintiff argues that this mistake prevents
the Court from affirming the ALJ's decision because the evidence
the ALJ relied upon in making his decision cannot be known.
(Pl.'s Reply at pp. 9-10, ECF No. 13).

The ALJ's citation mistake does not amount to legal error.
The ALJ cited to Exhibit 11F, pages 31 and 32, which should have
been Exhibit 12F, pages 31 and 32.  (See AR at p. 23, ECF No. 8).
At Exhibit 12F, there is evidence that Plaintiff traveled to the
mainland and went fishing on a daily basis.  The content to which
the ALJ meant to reference is easily discernable and it appears
at Exhibit 12F, pages 31 and 32.  (AR at pp. 785-86).  The ALJ
correctly cited Exhibit 12F, pages 31 and 32 for the same
proposition elsewhere in his decision.  (See AR at p. 18).

The ALJ's typo, mistaking "11F" and "12F," does not
undermine the validity of an ALJ's decision where, as here, the
ALJ's intent is clear.[1]

_____

[1] See, e.g., Denise F. v. Kijakazi, 2022 WL 888680, at *4
(C.D. Cal. Mar. 25, 2022) (holding that ALJ's erroneous use of
"infra" as opposed to "supra" in a citation was a "harmless

Second, Plaintiff contends that the ALJ's citation to only five pages altogether is insufficient to show the consistency of Dr. Rabara's opinion with the record.  (Id. at p. 20).

The legal sufficiency of an ALJ's assessment of a medical opinion is not measured by the number of page citations he provides.  Rather, the question is whether the ALJ assessed the medical opinion for its supportability and consistency with the record as a whole.  20 C.F.R. § 404.1520c.  Throughout the decision, the ALJ provided numerous page citations to the pieces of medical evidence that the ALJ referenced as being inconsistent with Dr. Rabara's opinion.  It is clear that the ALJ's review of Dr. Rabara's opinion was not strictly limited to the handful of pages cited in the paragraph dedicated to the opinion's persuasiveness.  The path of the ALJ's reasoning, which included an overall assessment of the record, is clearly discernable.  Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014).

The ALJ's analysis and conclusions as to Dr. Rabara's opinion are supported by substantial evidence.

---

scrivener's error"); Miller v. Colvin, 2015 WL 6455097, at *3 (W.D. Wash. Oct. 26, 2015) (holding that "[a] mere scrivener's error is not a basis to reverse the ALJ's decision" where ALJ misidentified plaintiff's age), aff'd sub nom. Miller v. Berryhill, 686 F. App'x 478 (9th Cir. 2017); Poppa v. Astrue, 569 F.3d 1167, 1172 n.5 (10th Cir. 2009) (finding the ALJ's incorrect statement of a date was a "mere scrivener's error" that did not affect the outcome of the case).

C.   **Dr. Tanya D'Avanzo, Ph.D**

Pursuant to the revised regulations, the ALJ's obligation to evaluate medical opinion evidence under the supportability and consistency factors is triggered only if the evidence meets the definition of a "medical opinion."  The definition of what constitutes a medical opinion provided by the revised regulation is narrower than the prior definition.  The regulations now provide the following definition of a medical opinion:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:...
>
>> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>>
>> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>>
>> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>>
>> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2).

On February 26, 2019, Dr. Tanya D'Avanzo examined Plaintiff

32

for a neuropsychological evaluation.  (AR at p. 535-37, ECF No. 8).  Dr. D'Avanzo administered several psychological exams.  (AR at p. 535-37).  Dr. D'Avanzo's report memorialized the evaluation, Plaintiff's behavior during the exam, and his test scores.  (AR at p. 535-37).

Dr. D'Avanzo's report states that Plaintiff appeared passive and withdrawn, consistent with moderate and chronic depression. (AR at p. 537).  The report states that Plaintiff's "current general level of cognitive functioning ... appears Average for his age."  (AR at p. 536).  Plaintiff showed "relative weakness" in his working memory, but his recall of complex figures was "superior after long delay."  (AR at p. 536).

Plaintiff argues that Dr. D'Avanzo's report constitutes a medical opinion and therefore required that the ALJ evaluate its persuasiveness pursuant to the supportability and consistency factors.  (Pl.'s Br. at p. 15, ECF No. 11).  Under the revised regulations, Plaintiff's argument is incorrect.  Dr. D'Avanzo's report is not a medical opinion, because it did not consider what Plaintiff could still do despite his impairments, or his ability to perform the demands of work activities.  See 20 C.F.R. § 404.1513(a)(2).

Dr. D'Avanzo's report provided no indication of what Plaintiff is able to do in terms of work activities.  The report touches on Plaintiff's capacity for recall, but Dr. D'Avanzo does

not put her findings in terms of Plaintiff's ability to meet the demands of the workplace.  The report merely provides Dr. D'Avanzo's clinical findings and judgments about the severity of Plaintiff's impairments.

It was appropriate for the ALJ to consider Dr. D'Avanzo's report as "other medical evidence," which includes "judgments about the nature and severity of [a claimant's] impairments," and "clinical findings."  Id. at 404.1513(a)(3); see also Kava v. Kijakazi, Civ. No. 20-00385 ACK-WRP, 2021 WL 4267505, at *11 (D. Haw. Sept. 20, 2021) (concluding that the ALJ was not required to treat a doctor's notes as a medical opinion because they did not address what the claimant "is still able to do or whether he has restrictions in work activities"); De La Cruz v. Kijakazi, 2022 WL 1556411, at *11 (N.D. Cal. May 17, 2022) (concluding that ALJ was not required to evaluate medical evidence that did not meet the definition of a medical opinion).

The ALJ considered D'Avanzo's report as medical evidence in formulating Plaintiff's residual functional capacity.  (AR at pp. 18, 22, ECF No. 8).  The report did not meet the requirements of a medical opinion.

## SUMMARY

In sum, the ALJ found that Plaintiff could perform light work with enumerated limitations.  The ALJ properly considered

34

the medical evidence in the record and concluded, that although Plaintiff had physical limitations due to degenerative disc disease, Plaintiff's symptoms were well-managed with pain mediation and physical therapy.  The ALJ ruled that Plaintiff's psychological symptoms had improved with medication.  Plaintiff's medical records reflected that Plaintiff decided that his mental health condition had so improved he no longer took antidepressant medication.

The ALJ properly concluded that Plaintiff's history of travel and engagement in numerous daily activities supported his finding that Plaintiff he was able to perform light work with limitations.

The Court reviewed the entire record and finds that there is substantial evidence to support the ALJ's decision.  <u>Woods</u>, 32 F.4th at 787.

//

//

//

//

//

//

//

//

//

35

## CONCLUSION

The Social Security Administration Commissioner's decision denying Plaintiff's application for disability benefits is supported by substantial evidence from the record.

The Commissioner's decision is **AFFIRMED**.

The Clerk of Court is Ordered to **CLOSE THE CASE**.

DATED: December 27, 2022, Honolulu, Hawaii.

IT IS SO ORDERED.



Helen Gillmor
United States District Judge

Christopher Robin Albright v. Kilolo Kijakazi, 21-cv-00507 HG-KJM, **ORDER AFFIRMING THE DECISION OF THE SOCIAL SECURITY ADMINISTRATION COMMISSIONER**

36